UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO. _____

**JTH TAX LLC d/b/a LIBERTY TAX SERVICE,**

    Plaintiff,

v.

**GLENDA ARONG, GARY GANZIE, OPTIMUM FINANCIAL SERVICES, INC., and GET RESULTS FAST, INC.,**

    Defendants.
_____/

**PLAINTIFF'S VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

Plaintiff JTH Tax LLC (f/k/a JTH Tax, Inc.) d/b/a Liberty Tax Service ("Liberty"), by counsel, allege for its Verified Complaint against Defendants Gloria Arong ("Arong"), Optimum Financial Services, Inc. ("Optimum"), Gary Ganzie ("Ganzie"), and Get Results Fast, Inc. ("GRF") (collectively "Defendants"), and states as follows:

**INTRODUCTION**

1. After Liberty unilaterally terminated Arong and Optimum's franchise agreement for breaching the non-competition covenants, Defendants sought Liberty's rescission and a mutual termination of the franchise agreement. On October 25, 2019, the Parties entered into a Mutual Termination Agreement whereby each of the Defendants agreed and covenanted not to directly or indirectly compete with Liberty for a period of 2 years within 25 miles of the former Franchise Territory, immediately transfer all client files to Liberty or its designated representative, transfer the telephone numbers used in relation to the former Franchised Business, and return Liberty's

1
**GORDON REES SCULLY MANSUKHANI**
100 SE Second Street, Suite 3900, Miami, FL 33131

confidential Operations Manual. In exchange, Liberty agreed to release Arong and Optimum from the amounts due under the terms of the Franchise Agreement contingent on their complying with the covenant not to compete. Within months of executing the Mutual Termination Agreement, Defendants began preparing tax returns within a few miles of the former Franchise Location in violation of their non-compete.

2. Liberty seeks an immediate injunction (1) enjoining all Defendants from breaching their non-competition covenants, (2) enjoining any of the Defendants' from using any of Liberty's confidential information, and (3) enjoining Defendants from diverting or attempting to divert any customer or business from Liberty or soliciting or endeavoring to obtain the business of any person who shall have been a customer of the Franchise Location for a period of two years.

## PARTIES

3. Plaintiff Liberty is a Delaware limited liability company with its principal place of business at 1716 Corporate Landing Parkway, Virginia Beach, Virginia 23454. Liberty and its affiliates maintain franchises and company-owned income tax preparation offices throughout the United States, including the Commonwealth of Virginia.

4. Defendant Arong is a natural person with a last known residential address of 6717 Mornay Circle, Tampa, Florida 33615 and a business address of 1210 6 Ave W, Suite 100, Bradenton, Florida 34205.

5. Defendant Optimum is a Florida corporation with its principal place of business at 1210 6 Ave W, Suite 100, Bradenton, Florida 34205. The State Division of Corporations' corporate records identify Arong as Optimum's President, Secretary, and Director and Ganzie as Optimum's Vice-President, Treasurer, and Director.

6. Defendant Ganzie is a natural person with a last known residential address of 6717 Mornay Circle, Tampa, Florida 33615 and a business address of 6601 Memorial Highway, Suite 201, Tampa, Florida 33615.

7. Defendant GRF is a Florida corporation with its principal place of business at 6601 Memorial Highway, Suite 201, Tampa, Florida 33615.  The State Division of Corporations' corporate records identify Ganzie as GRF's registered agent, President, Treasurer, and Director. GRF's November 19, 2018 Amendment removes Arong as GRF's Secretary and Director, but does not remove her as GRF's Vice-President.

## JURISDICTION AND VENUE

8. This Court has personal jurisdiction over each of the Defendants because Arong and Ganzie are natural persons who are citizens of the State of Florida, Optimum and GRF are Florida corporations whose members are Florida citizens.

9. This Court has original subject matter jurisdiction pursuant to the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b)(1), and supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy as the claim under the DTSA.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, or a substantial part of property that is the subject of the action is situated in this District.

## FACTUAL BACKGROUND

**Liberty**

11. Liberty is a franchisor of Liberty Tax Service® income tax preparation service centers located throughout the United States, including the State of Florida.

12. Liberty owns the federally-registered Liberty Tax Service® trademarks, service marks, logos, and derivations thereof (the "Marks"), including U.S. Registration Nos. 2314991, 2467670, 2479692, 3167134, and 5509978, as well as the distinctive and well-known Liberty Tax Service® system, which sells income tax preparation and filing services and products to the public under the Liberty Marks.

13. Liberty grants licenses to franchisees to use the Marks and participate in its confidential and proprietary business system pursuant to written franchise agreements, which are reasonably and carefully tailored to protect Liberty's valuable confidential information, reputation, goodwill, and other legitimate business interests.

14. Liberty discloses certain confidential information, including methods of operation of franchise, customer information, and marketing information, to franchisees through its Operations Manuals, training manuals, training programs, and in providing guidance and assistance to its franchisees pursuant to a franchise agreement. Liberty requires that its franchisees agree, that upon expiration, termination, or nonrenewal of a franchise agreement, they will never use, disclose, or permit the use or disclosure of Liberty's confidential information in any manner whatsoever. Liberty requires that upon termination, expiration, or nonrenewal of a franchise agreement, the former franchisee will stop using all literature and forms received from Liberty, deliver to Liberty all customer information and files, and deliver to Liberty all copies of its Operations Manual and any updates thereto.

15. As a result of these efforts and expenditures, the Marks have become associated in the minds of consumers with uniform goods and services of consistently high quality, provided only by persons following Liberty's approved sales, operating methods, and procedures.

16.     Liberty has used the Marks, along with the efforts of its hardworking employees, to grow from five offices in 1998 to over 3,000 today.

17.     Liberty has grown to be one of the largest tax preparation franchises in the U.S.A.

18.     Liberty plays an important role in the local Virginia Beach economy, as well as the Florida economy, with a network of over 12,000 tax preparers.

19.     January through April is Liberty's busiest time of year, during which time the majority of returns are prepared.

**Obligations Under the Franchise Agreement and Mutual Termination Agreement**

20.     On approximately December 7, 2010, Arong entered into a franchise agreement with Liberty (the "Franchise Agreement") for the territory known as FL093 (the "FL093Territory").  The term of the Franchise Agreement was five years with specific terms for renewal.

21.     On approximately April 14, 2015, Arong amended the name of a corporation she owned from Optimum Rehabilitation Services, Inc. to Optimum Financial Services, Inc.  As of the date of the amendment, Arong was President and Secretary and Ganzie was Treasurer of Optimum.

22.     The Franchise Agreement was amended on January 14, 2016 to remove Arong and substitute Optimum as franchisee, to continue with Arong as guarantor of the Franchise Agreement, and to add Ganzie as guarantor of the Franchise Agreement.

23.     On approximately January 27, 2016, Optimum renewed the Franchise Agreement. **Exhibit A**.

24.     The Franchise Agreement was amended on June 26, 2018 to remove Ganzie as guarantor of the Franchise Agreement.

25. Pursuant to the Franchise Agreement, Liberty provided Arong, Ganzie, and Optimum with training in franchise operation, marketing, advertising, sales, and business systems. Arong, Ganzie, and Optimum also received a copy of Liberty's confidential operating, marketing, and advertising materials, which are not available to the public or to anyone who is not part of Liberty's franchise system.

26. In exchange for Liberty's grant of a franchise allowing Arong, Ganzie, and Optimum to "operate a tax return preparation business using Liberty's system and Liberty's Marks within the Territory", Arong, Ganzie, and Optimum agreed to certain obligations while operating under the Franchise Agreement.

27. Under the Franchise Agreement, Arong and Optimum agreed to pay Liberty Royalties, **Ex. A** § 4(d), and an Advertising Fee, *id.* § 4(e), which are calculated as a percentage of the franchisees' monthly Gross Receipts. Arong and Optimum agreed to pay Liberty the royalty and advertising fees by the fifth of each month, *id.* § 4(f).

28. Arong and Optimum agreed to pay interest on amounts due under the Franchise Agreement at a rate of 12% compounded daily on any amounts that are fifteen days past due. *Id.* § 4(g).

29. Liberty records as accounts receivable ("A/R") the amounts due from a franchisee under the Franchise Agreement, e.g., Royalties and Advertising Fee.

30. Pursuant to Section 9 of the Franchise Agreement, Arong and Optimum agreed to the certain post-termination obligations, including, but not limited to, "g. Deliver to Liberty any original and all copies, including electronic copies and media, of lists and other sources of information containing the names, addresses, e-mail addresses, or phone numbers of customers of the Franchised Business; and h. Deliver to Liberty any original and all copies, including electronic

copies and media, containing customer tax returns, files, and records; and i. Deliver to Liberty all copies of the Manual and any updates; and … k. Adhere to all applicable provisions contained herein including, but not limited to, the post-term covenants not to compete and not to solicit." *Id.* § 9.

31. Pursuant to Section 10(b) of the Franchise Agreement, Arong and Optimum agreed to a post-term covenant not to compete, which provides that, "[f]or a period of two (2) years following the termination, expiration, transfer or other disposition of the Franchised Business, or your removal as a signator to this Agreement, you agree not to directly or indirectly, for a fee or charge, prepare or electronically file income tax returns, or offer Financial Products, within the Territory or within twenty-five (25) miles of the boundaries of the Territory except, if applicable, in your capacity as a SiempreTax or Liberty Tax franchisee pursuant to a valid SiempreTax or Liberty franchise agreement." *Id.* § 10(b).

32. The post-term non-competition covenant contained in Section 10(b) of the Franchise Agreement is necessary to protect Liberty's legitimate, protectable interest in its franchise businesses, including but not limited to:

    A.    Maintaining and protecting Liberty's goodwill and customer loyalty;

    B.    Retaining customer relationships;

    C.    Liberty's customer lists, customer identification, tax returns, and other confidential information; and

    D.    Preserving Liberty's ability to facilitate the operation of Liberty franchises in the Territory.

33. Pursuant to Section 10(h) of the Franchise Agreement, Arong and Optimum agreed "that the provisions of Section 10 are reasonable, valid and not contrary to the public interest." To that end, Arong and Optimum agreed to "waive all defenses to the strict enforcement of Section 10," and further agreed that "Liberty is entitled to a temporary restraining order, preliminary and/or

permanent injunction for any breach of duties under any of the non-monetary obligations of Sections 9 and 10." *See* **Ex. A**.

34. Pursuant to Section 12 of the Franchise Agreements, Arong and Optimum acknowledged that information provided by Liberty to them regarding, among other things, Liberty's methods, techniques, formats, specifications, procedures, information, systems, and customer and marketing information was confidential, and was to be used only in connection with the operation of the Franchised Business. *Id.*

35. Pursuant to Sections 12(a) of the Franchise Agreement, Arong and Optimum agreed that "During the term of this Agreement and following the expiration or termination of this Agreement, you covenant not to directly or indirectly communicate, divulge, or use any Confidential Information for your personal benefit or the benefit of any other person or legal entity except as specifically provided by the terms of this Agreement or permitted by Liberty in writing prior to disclosure." *Id.*

36. Pursuant to Section 12(c) of the Franchise Agreement, Arong and Optimum agreed that they would "(a) not use the Confidential Information for any purpose other than the operation of the Franchised Business pursuant to this Agreement; (b) maintain absolute confidentiality of the Confidential Information during and after the term of this Agreement; (c) not make unauthorized copies of any portion of the Confidential Information disclosed in written form; and (d) adopt and implement all reasonable procedures, including, but not limited to, those Liberty prescribes from time to time, to prevent unauthorized use of or disclosure of the Confidential Information." *Id.*

**Obligations Under the Mutual Termination Agreement**

37.     Liberty unilaterally terminated the Franchise Agreement on October 1, 2019. Following discussions with Defendants, Liberty agreed to rescind the termination in favor of a Mutual Termination Agreement.

38.     On or about October 25, 2019, Arong, Ganzie, Optimum and GRF, and Liberty entered into a Mutual Termination Agreement for the FL093 Franchise Agreements.  **Exhibit B**.

39.     Arong and Optimum agreed to strictly adhere to the covenants not to compete and not to solicit, *id.* §§ 2(a)(iii), 5(a), immediately transfer client files to Liberty or its designated representative, *id.* §§ 2(a)(ii), 5(f)-(g), immediately deliver to Liberty the confidential Operations Manual and all updates, *id.* § 5(h), and transfer to Liberty all telephone numbers used in relation to the Franchised Business, *id.* § 5(e).

40.     Ganzie and GRF agreed that "for a period of two (2) years following the execution of this Agreement, Ganzie [and GRF] will not directly or indirectly, for a fee or charge, prepare or electronically file income tax returns, or offer Financial Products, within the Territory or within twenty-five (25) miles of the boundaries of the Territory." *Id.* § 2(c). Ganzie and GRF further agreed to adhere to all post-term obligations of the Franchise Agreement, *id.* § 4, immediately comply with the covenants not to compete and not to solicit set forth in the Franchise Agreement, *id.* § 5(a), immediately transfer client files to Liberty or its designated representative, *id.* § 5(f)-(g), immediately deliver to Liberty the confidential Operations Manual and all updates, *id.* § 5(h), and transfer to Liberty all telephone numbers used in relation to the Franchised Business, *id.* § 5(e).

41.     Liberty agreed that it would release Optimum and Arong "from any and amounts owed now or in the future under the terms of the Franchise Agreement **strictly contingent upon**

[Optimum and Arong] complying with all post-termination obligations under the Franchise Agreement, including but not limited to the following: … (iii) [Optimum and Arong's] strict adherence to the covenants not to compete and not to solicit, and (iv) the post-termination obligations described in Section 5 below." *Id.* § 2(a). Should Arong, Optimum, Ganzie, or GRF fail to comply with the terms of the Mutual Termination Agreement, all amounts owed to Liberty would be rendered immediately due and owing. *Id.*

42. Pursuant to the Mutual Termination Agreement, Liberty and Defendants agreed that "Virginia law governs all claims which in any way relate to or arise out of this Agreement or any of the dealings of the parties hereto." *Id* § 12.

**Unfair Competition and Breach of Post-Termination Obligations**

43. Immediately preceding the termination of the Franchise Agreement, the franchise operated from 1910 W. Martin Luther King, Jr. Blvd., Tampa, Florida 33607 (the "Franchise Location").

44. After executing the Mutual Termination Agreement, Ganzie and GRF amended GRF's principal place of business to 6601 Memorial Highway, Suite 201, Tampa, Florida 33615. GRF's new principal place of business is less than 8 miles from the former Franchise Location.

45. After executing the Mutual Termination Agreement, Arong and Optimum amended Optimum's principal place of business to 1210 6 Ave W, Suite 100, Bradenton, Florida 34205.

46. During the 2019 tax season, Ganzie has been and will continue to prepare tax returns through GRF within 25 miles of the former Franchise Location.

47. Upon information and belief, Arong and Optimum have been and will continue to prepare tax returns during the 2019 tax season from GRF. Despite maintaining corporate records that identify 1210 6th Avenue W, Suite 100, Bradenton, Florida 34205 as its principal place of business, Optimum is not actually located at that address.

48. Defendants have not transferred to Liberty the telephone numbers used in relation to the Franchised Business.

49. Defendants have not delivered to Liberty all copies, including electronic copies, of lists and other sources of information containing the names of customers who patronized the Franchised Business.

50. Defendants have not delivered to Liberty all customer tax returns, files, records and all copies thereof.

51. Defendants have not delivered to Liberty the confidential Operations Manual and all updates.

**Breach of the Franchise Agreement Monetary Obligations**

52. As of March 11, 2019, Arong and Optimum have not paid Liberty the outstanding A/R in the amount of $3,949.39.

## COUNT I
### *Breach of the Mutual Termination Agreement*
### *(Equitable Claim)*

53. Liberty repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

54. The Mutual Termination Agreement is valid and enforceable.

55. Liberty has performed every obligation and condition required of it under the Mutual Termination Agreement.

56. Pursuant to Sections 2(a), 2(b), and 5 of the Mutual Termination Agreement, all Defendants agreed to adhere to the covenants not to compete and not to solicit.

57. All Defendants are currently competing against Liberty by preparing and electronically filing income tax returns through Republic Bank within 25-miles of the former Franchise Location and within two-years of the October 25, 2019 Mutual Termination Agreement.

11

58. Pursuant to Section 5(e) of the Mutual Termination Agreement, Defendants agreed to transfer to Liberty the telephone numbers used in relation to the Franchised Business.

59. To date, Defendants have not transferred to Liberty the telephone numbers used in relation to the Franchised Business.

60. Pursuant to Section 5(f) of the Mutual Termination Agreement, Defendants agreed to deliver to Liberty all copies, including electronic copies, of lists and other sources of information containing the names of customers who patronized the Franchised Business.

61. To date, Defendants have not delivered to Liberty all copies, including electronic copies, of lists and other sources of information containing the names of customers who patronized the Franchised Business.

62. Pursuant to Section 5(g) of the Mutual Termination Agreement, Defendants agreed to deliver to Liberty all customer tax returns, files, records and all copies thereof.

63. To date, Defendants have not delivered to Liberty all customer tax returns, files, records and all copies thereof.

64. Pursuant to Section 5(h) of the Mutual Termination Agreement, Defendants agreed to deliver to Liberty the confidential Operations Manual and all updates.

65. To date, Defendants have not delivered to Liberty the confidential Operations Manual and all updates.

66. Defendants' breaches set forth above are material breaches of the Mutual Termination Agreement.

67. As a direct and proximate result of these breaches, Liberty has incurred, and will continue to incur substantial losses, fees, and expenses for which Defendants are liable.

68. As a result of Defendants' past, present, and continued breaches, Liberty has suffered and will continue to suffer actual, substantial, and irreparable damage, including, but not limited to:

   A. Loss of customer goodwill and loyalty;

   B. Loss of business opportunities and relationships to provide tax preparation services and related services;

   C. Loss of customers;

   D. Loss of profits;

   E. Loss of franchisee stability;

   F. Loss of ability to sell other franchises;

   G. Loss of value in confidential business information;

   H. Loss of competitive advantage in Tampa, Florida and the FL093 Territory;

   I. Attorneys' fees; and

   J. Cost of this action.

69. Liberty has been and will be irreparably harmed by Defendants' actions, and monetary damages are an insufficient remedy in that it can only potentially quantify a limited loss of customers, but cannot take into account the continuing irreparable damage to the value of Liberty's confidential information, goodwill, customer loyalty, and its ability to sell franchises, all of which are caused by Defendants' ongoing violations.

70. Unless their wrongful conduct is enjoined, Defendants will continue to breach their obligations by continuing to breach the non-competition covenants, continuing to use Liberty's customer lists and methods of operations to divert business to Defendants, and continuing to disclose and use Liberty's confidential information.

## COUNT II
### *Breach of the Mutual Termination Agreement – Past Due A/R*
### *(Monetary Claim)*

71. Liberty repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

72. The Franchise Agreement and Mutual Termination Agreement are valid and enforceable.

73. Liberty has performed every obligation and condition required of it under the Franchise Agreement and Mutual Termination Agreement.

74. As of the filing of this Verified Complaint, Arong and Optimum have not paid Liberty the outstanding A/R in the amount of $3,949.39.

75. Arong and Optimum breached the Mutual Termination Agreement as set forth above, specifically Sections 2(a), 2(b), and 5(e)-(h).

76. Due to Arong and Optimum's breaches of the Mutual Termination Agreement, all amounts due under the Franchise Agreement are rendered immediately due and owing.

## COUNT III
### *Breach of the Mutual Termination Agreement – Non-Compete Covenant*
### *(Monetary Claim)*

77. Liberty repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

78. The Mutual Termination Agreement is valid and enforceable.

79. Liberty has performed every obligation and condition required of it under the Mutual Termination Agreement.

80. Arong and Optimum agreed not to compete with Liberty for a period of 2 years within 25 miles of the Territory, pursuant to Sections 2(a), 4, and 5(a) of the Mutual Termination Agreement.

81. Ganzie and GRF agreed not to compete with Liberty for a period of 2 years within 25 miles of the Territory, pursuant to Sections 2(c), 4, and 5(a) of the Mutual Termination Agreement.

82. During the 2019 tax season, Defendants have prepared and filed tax returns at 6601 Memorial Highway, Suite 201, Tampa, Florida, which is within 8 miles of the former Franchise Location.

83. Defendants' breaches set forth above are material breaches of the Mutual Termination Agreement.

84. As a direct and proximate result of Defendnats' breaches of the Mutual Termination Agreement, Liberty has suffered and will continue to suffer damages in an amount to be proven at trial, for which Defendants are liable, including, but not limited to, compensatory damages, consequential damages, liquidated damages, and disgorgement of Defendants' profits.

## COUNT IV
### *Defend Trade Secrets Act*

85. Liberty repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

86. The Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, provides a private civil action for the misappropriation of a trade secret that is related to a product or service used in, or intended for use in, interstate or foreign commerce.

87. Liberty owns numerous trade secrets, including but not limited to, its Operations Manual, training manuals, training programs, marketing strategies, marketing programs, and customer lists, related to products and services used in interstate commerce.

88. Each of Liberty's trade secrets derives independent economic value from not being generally known to and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

89. Liberty's trade secrets are not readily ascertainable by the public as they are disclosed only to franchisees in the operation of a franchised business pursuant to a franchise agreement.

90. During the operation of the Franchised Business, Liberty's trade secrets were disclosed to Arong, Ganzie, and Optimum for the sole purpose of operating the Franchised Business pursuant to the Franchise Agreement.

91. Liberty has taken extensive measures to preserve and protect these trade secrets for the purpose of maintaining its competitive advantage in the marketplace.

92. The Franchise Agreement and Mutual Termination Agreement explicitly provide for the protection of such trade secrets, including requiring the delivery of all originals and copies of such information to Liberty upon the execution of the Mutual Termination Agreement, requiring former franchisees and their representatives to maintain the confidentiality of the information, and requiring former franchisees and their representatives to never use the information for any purpose other than operating a Franchised Business pursuant to the Franchise Agreement.

93. Liberty required and Defendants agreed that immediately upon entering into the Mutual Termination Agreement, they would deliver to Liberty all confidential information, e.g., customer files and information and the Operations Manual.

94. Without authority or consent from Liberty, Defendants used the business know-how, customer lists, and customer contact information that Arong, Ganzie, and Optimum obtained while operating the former Franchised Business to obtain business for themselves, thereby misappropriating Liberty's trade secrets.

**GORDON REES SCULLY MANSUKHANI**
100 SE Second Street, Suite 3900, Miami, FL 33131

95. Upon information and belief, Defendants used and are utilizing Liberty's confidential system and materials after the execution of the Mutual Termination Agreement and Liberty has not and would not consent to or authorize such use.

96. Defendants intentionally and without Liberty's permission or authorization misappropriated and/or disclosed Liberty's trade secrets for their own economic benefit and with the intention and knowledge that their conduct would injure Liberty by, for example, causing Liberty to lose any customers successfully solicited by Defendants.

97. As a direct and proximate result of Defendants' willful, improper, and unlawful disclosure and Defendants' willful, improper, and unlawful use of Liberty's trade secrets, Liberty has suffered and will continue to suffer irreparable injury.

98. Pursuant to 18 U.S.C. § 1836(b)(3)(A), Defendants' actual and threatened use and misappropriation of Liberty's trade secrets should be enjoined from further disclosure or use of Liberty's trade secrets.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff JTH Tax LLC d/b/a Liberty Tax Service prays for judgment against Defendants Glenda Arong, Gary Ganzie, Optimum Financial Services, Inc., and Get Results Fast, Inc. as follows:

1. For the following injunctive relief:

    A. Enjoin Defendants from breaching their non-competition covenants set forth in the Mutual Termination Agreement;

    B. Enjoin Defendants from using any of Liberty's confidential information;

    C. Enjoin Defendants from diverting or attempting to divert any customer or business from Liberty or to solicit or endeavor to obtain the business of any person who shall have been a customer of the Franchise Location for a period of two years.

   D.  Order the transfer to Liberty of the telephone numbers used in relation to the Franchised Business;

   E.  Order the delivery to Liberty all copies, including electronic copies, of list and other sources of information containing the names of customers who patronized the Franchised Business;

   F.  Order the delivery to Liberty all customer tax returns, files, records, and all copies thereof; and

   G.  Order the delivery to Liberty of the Operations Manual and all updates.

 2. For a monetary award against Defendants in excess of $30,000 to be proven at trial, including, but not limited to, compensatory damages, expectancy damages, punitive damages, and disgorgement of profits;

 3. For pre- and post-judgment interest; and

 4. For such other relief as the Court deems just and appropriate.

Respectfully submitted this 28th day of April, 2020.

              **GORDON REES SCULLY MANSUKHANI, LLP**

              By: */s/ Capri Trigo*
              Capri Trigo
              Florida Bar No. 28564
              Miami Tower
              100 SE Second Street, Suite 3900
              Miami, Florida 3313
              305.428.5300
              877.634.7245 (Facsimile)
              ctrigo@grsm.com

              *Attorneys for JTH Tax LLC d/b/a Liberty Tax Service*

## **VERIFICATION**

Anthony Cali does hereby verify and state pursuant to 28 U.S.C. § 1746:

I am a Regional Director for JTH Tax LLC (f/k/a JTH Tax, Inc.) d/b/a Liberty Tax Service ("Liberty"). I have read the foregoing Verified Complaint and know the contents thereof and state that the allegations are true. I base this Verification on my own knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true. The grounds of my knowledge, information and belief are derived from my position as Regional Director at Liberty, my personal involvement in the events underlying this litigation, and general investigation of the facts and circumstances described in the Verified Complaint, including, without limitation, my review of Liberty's records, and conversations with Liberty's employees.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the __24th__ day of April, 2020.

DocuSigned by:

*[signature]*

C200D628F84C4A5...

Anthony Cali

**GORDON REES SCULLY MANSUKHANI**
100 SE Second Street, Suite 3900, Miami, FL 33131